# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 31, 2013

No. 12-10063

Lyle W. Cayce
Clerk

In the Matter of:  PILGRIM'S PRIDE CORPORATION,

Debtor

-------------------------------------------------------------------------------------------------------------

CLINTON GROWERS; BILLY APPLEBY; RICKY ARNOLD; DEBBIE ARNOLD; LILLIAN BASS; ET AL,

Appellants,

v.

PILGRIM'S PRIDE CORPORATION, and the other movants/Reorganized Debtors: PFS Distribution Company, PPC Transportation Company, To Ricos, Ltd., To  Ricos Distribution, Ltd., Pilgrim's Pride Corporation of West Virginia, Inc., and PPC Marketing, Ltd.,

Appellee.

Appeal from the United States District Court
for the Northern District of Texas

No. 12-10063

Before DeMOSS, SOUTHWICK, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

Appellee Pilgrim's Pride Corporation ("PPC") contracted with Appellants Clinton Growers (the "Growers") to raise chickens. Citing a downturn in the poultry industry, PPC terminated its contracts with the Growers and filed for bankruptcy. The Growers filed claims against PPC seeking promissory estoppel relief, alleging that the company's oral promises of a long-term relationship induced them to invest in chicken houses. The district court affirmed the bankruptcy court's grant of summary judgment for PPC on the ground that the written contracts between PPC and the Growers barred the alleged oral promises. We also AFFIRM.

1. Facts and Proceedings

PPC acquired ConAgra Poultry Company in 2003. As part of the acquisition, PPC began operating a chicken processing plant in Clinton, Arkansas.

PPC contracted with chicken farmers to supply the plant with poultry. The farmers received chicks and feed from PPC. In exchange, the farmers built and maintained chicken houses on their land at a cost of about $150,000 per house. The farmers raised the chicks to maturity and then sold them back to PPC at a price based on the their weight.

The Growers are a collection of more than 100 chicken farmers who supplied poultry to PPC.[1] Each Grower signed individual contracts, but the agreements contained similar terms. Section C of a representative contract

---

[1] Many Growers had entered into contracts with ConAgra that PPC continued to honor after the acquisition; others signed agreements with PPC after the company acquired ConAgra.

2

specified that the agreement was "to continue on a flock to flock basis."[2] Section D stated that either party could terminate the contract without cause between flocks—which lasted between four and nine weeks—but that PPC could end the agreement at any time for "cause or economic necessity." The contracts also included: sections describing the Growers' compensation;[3] sections detailing the Growers' obligation to maintain chicken houses to PPC's specifications;[4] a merger clause representing that the contract "supersedes, voids and nullifies" all prior agreements and oral statements;[5] and a paragraph preventing oral modifications.[6]

---

[2] Section C provided in full:

Term. The term of this Agreement shall commence on the date of execution of this Agreement, continue on a flock to flock basis, and shall terminate upon completion of the engagement(s) subject to the right of the Company to terminate this Agreement upon written notice to the Independent Grower in the event the Independent Grower does not timely perform its obligations hereunder as provided in this Agreement.

[3] Section B and Exhibits A and B to the agreement detailed the Growers' pay arrangement with PPC.

[4] Section G, ¶ 1 provided: "Basic Housing. The Independent Grower shall provide and maintain proper housing, equipment, litter and utilities in accordance with the Company's specifications and applicable regulations."

[5] Section H, ¶ 9 provided in full:

Prior Agreements/Entire Agreement. This agreement supersedes, voids and nullifies any and all previous Broiler Production Agreements and all other previous agreements governing the relationship between Independent Grower and Company. The Independent Grower and Company hereby release and extinguish all claims that they may have against each other under any previous Broiler Production Agreement and all other previous agreements governing the relationship between Independent Grower and Company. This Agreement, and any Exhibits hereto, constitute the entire agreement between the parties, and those documents supersede all oral statements and other communications made before the execution of those documents. Independent Grower acknowledges that in entering into this Agreement, he/she has not relied upon any statements that are not contained in this document, and/or the Exhibits hereto.

[6] Section H, ¶ 12 provided: "No Modification Except in Writing. The parties agree that this Agreement and the Exhibits hereto may not be modified except in writing signed by both the Company and Independent Grower."

No. 12-10063

The Growers contend that, notwithstanding the terms of the contract, PPC officials made oral representations that the company would maintain a long-term relationship with them. For example, the Growers claim that PPC assured them: that PPC "was here for the long haul"; that the Growers would receive chickens as long as they met PPC's specifications; and that the Growers would "more than cover the costs of building and raising the chickens" in the long run if they upgraded their chicken houses.

Citing economic stress caused by an increase in the cost of chicken feed, and a drop in the price of chickens, PPC idled the Clinton plant and terminated its contracts with the Growers in 2008. The Growers brought promissory estoppel claims against PPC when the company filed for Chapter 11 protection in late 2008.[7]

As the bankruptcy case unfolded, Northern District of Texas Judge Terry Means rejected similar estoppel claims brought by other growers against PPC. *See City of Clinton v. Pilgrim's Pride Corp.*, 654 F. Supp. 2d 536, 544-45 (*City of Clinton I*) (N.D. Tex. 2009). The district court, applying Texas law,[8] observed that estoppel "applies only where no contract on the subject matter exists." *Id.* at 544. The district court found that the contracts between PPC and the growers addressed the growers' "obligation to comply with Pilgrim's decisions regarding housing of the chickens, the duration of the grower arrangements, and how the growers would be compensated." *Id.* The district court also found that PPC's

---

[7] The Growers also alleged fraud and a state law claim, but do not raise these claims on appeal.

[8] The *City of Clinton I* growers were from multiple states, including Texas and Arkansas. *City of Clinton I*, 654 F. Supp. 2d at 539. The district court observed that Texas and Arkansas law were "the same regarding promissory estoppel," and chose to rely on Texas law. *Id.* at 544 n.1.

No. 12-10063

alleged oral promises—that, for example, the company "was committed to growers for the long run"—were too vague to induce reliance. *Id.* at 544-45.[9]

PPC filed multiple summary judgment motions in bankruptcy court after the *City of Clinton I* ruling. PPC argued that the Growers' promissory estoppel claims failed because: the written contracts covered the same subject matter as the alleged oral promises; the alleged promises were too vague to rely; and the merger doctrine, parol evidence rule, statute of frauds, and statute of limitations barred the Growers' claims arising from the alleged promises. PPC also argued that the *City of Clinton I* decision bound the bankruptcy court under the law-of-the-case doctrine.

Northern District of Texas Bankruptcy Judge D. Michael Lynn entered summary judgment for PPC, finding that Judge Means' ruling was binding under the law-of-the-case doctrine. *In re Pilgrim's Pride Corp.*, 442 B.R. 522, 530-31, 536-37 (Bankr. N.D. Tex. 2010). Judge Lynn also found that, even if the doctrine did not apply, the contracts barred the Growers' estoppel claims because both the contracts and the promises covered the same subject matter: the duration of the agreement. *Id.* at 535-36.

Northern District of Texas Judge John McBryde affirmed the bankruptcy court's ruling, but not on law-of-the-case grounds. *Clinton Growers v. Pilgrim's Pride Corp. (In re Pilgrim's Pride Corp.)*, BR 08-45664-DM111, 2011 WL 6396637, at *2 (N.D. Tex. Dec. 19, 2011). Although Judge McBryde found the bankruptcy court's law-of-the-case holding "persuasive," he held that the

---

[9] In a related case also before Judge Means, the City of Clinton sued PPC in connection with the closing of the Clinton plant. *City of Clinton v. Pilgrim's Pride Corp.*, 653 F. Supp.2d 669, 670-71 (*City of Clinton II*) (N.D. Tex. 2009). Clinton claimed that it invested in infrastructure in reliance on PPC's promises to keep its plant open. *Id.* Judge Means found that the doctrine of promissory estoppel did not apply because PPC's promises were too vague to induce reliance. *Id.* at 676-77. This court affirmed Judge Means' ruling, agreeing that PPC's promises were too vague. *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 155 (*City of Clinton III*) (5th Cir. 2010).

contracts barred the Growers' promissory estoppel claims because they covered the same subject matter as PPC's oral representations. *Id*. The Growers appealed.

2. Standards of Review

This court reviews the decision of a district court sitting as an appellate court in a bankruptcy case "by applying the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court." *Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 542 F.3d 131, 134-35 (5th Cir. 2008). "Generally, a bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed *de novo*." *Id*. at 135. A grant of summary judgment is a conclusion of law that is reviewed *de novo. SeaQuest Diving, LP v. S&J Diving, Inc.* (*In re SeaQuest Diving, LP*), 579 F.3d 411, 417 (5th Cir. 2009). This court may affirm on any grounds in the record. *Bonneville Power Admin. v. Mirant Corp.* (*In re Mirant Corp.*), 440 F.3d 238, 245 (5th Cir. 2006).

3. The "Contract Bar"

A party alleging promissory estoppel under Arkansas law[10] must show that there is "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance." *Van Dyke v. Glover*, 934 S.W.2d 204, 209 (Ark. 1996) (quoting the RESTATEMENT (SECOND) OF CONTRACTS, § 90). However, promissory estoppel applies only when "the elements of a contract cannot be shown." *Skallerup v. City of Hot Springs*, 309 S.W.3d 196, 201 (Ark. 2009)*; see also Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 934 (8th

---

[10] The contracts between PPC and the Growers specify under the heading "Choice of Law and Venue" that the "substantive laws of the State in which the farm is located shall govern the interpretation of this Agreement." The Growers' farms are located in Arkansas, and both parties agree that Arkansas law governs the substantive issues in this case.

Cir. 1999) ("The courts of Arkansas . . . have not applied [promissory estoppel] in order to determine the parties' rights under a contract that is otherwise enforceable. Their failure to do so reflects the widely accepted principle that promissory estoppel is applicable only in the absence of an otherwise enforceable contract."). This "contract bar" doctrine requires that courts "never accommodate[ ] a party with an implied contract when [the party] has made a specific one on the same subject matter." *Lowell Perkins Agency, Inc. v. Jacobs*, 469 S.W.2d 89, 93 (Ark. 1971). As a result, a party alleging promissory estoppel can succeed only by showing that the written contract does not cover the subject matter underlying the promissory estoppel claim. *See* 17A AM. JUR. 2D *Contracts* § 13; *see also Glenn Mech., Inc. v. S. Ark. Reg'l Health Ctr., Inc.*, 278 S.W.3d 583, 586-87 (Ark. Ct. App. 2008) (finding that a written contract describing compensation barred the defendant's alleged promises of extra pay because both the contract and the promises addressed compensation); *Moore v. Keith Smith Co.*, No. CA 08-884, 2009 WL 1232094, at *3-5 (Ark. Ct. App. May 6, 2009) (unpublished) (finding that a contract with a flock-to-flock term barred alleged promises of a long-term relationship to poultry farmers because "[p]romissory estoppel is not to be used as a vehicle to engraft a promise on a contract that differs from the written terms of the contract").

Here, the contracts between PPC and the Growers bar the Growers' promissory estoppel claims because the contracts and the claims cover the same subject matter: the duration of the agreements. The essence of PPC's alleged oral representations—for example, to commit to the Growers "for the long haul"—is the promise of a long-term relationship. The plain language of the contracts, however, specifies and is sure that the agreements between PPC and the Growers are to "continue on a flock to flock basis"—a time period spanning between four and nine weeks. Promises of a long-term relationship address the same durational subject matter as the continual short-term relationship

envisioned by the written "flock-to-flock" term. *See Moore*, 2009 WL 1232094, at *3-5.

The Growers also argue that the oral promises—for example, that the Growers would "more than cover the costs of building and raising the chickens" in the long run if they upgraded their chicken houses—not only addressed the written agreements' duration, but also enlarged the agreements' scope by inducing the Growers to invest in chicken houses. To the extent that we construe PPC's alleged oral promises to address subject matter other than duration, the plain language of the contracts bars the Growers' claims by detailing the Growers' compensation, along with their obligation to maintain the chicken houses to PPC's specifications.[11] As the district court correctly observed: "No plausible argument can be made that the statements on which Clinton Growers rely in support of their promissory estoppel theory are not directly dealt with in their broiler production contracts. The subjects of those statements are express elements of the contracts." *See Clinton Growers*, 2011 WL 6396637, at *6.

The Growers argue that the Arkansas Supreme Court's holding in *Tyson Foods, Inc. v. Davis*, 66 S.W.3d 568 (Ark. 2002), that a long-term oral promise is not the "same subject matter" as a short-term written one controls the outcome in this case. In *Tyson*, a hog processing company entered into a year-to-year contract with a hog grower that resembled the arrangement between the Growers and PPC. *Tyson*, 66 S.W.3d at 573. The grower claimed that he invested in hog-growing infrastructure in reliance on the company's promises

---

[11] The Growers argue it would have been "glaringly illogical" to borrow, and for banks to loan, large amounts of money to invest in the chicken houses based solely on the flock-to-flock written contract. Even if this were the case—the Growers provided the banks with copies of the flock-to-flock contracts—whether the Growers' decisions to invest in chicken houses were logical has no bearing on whether the written contracts covered the same subject matter as the alleged oral promises.

that he could "grow[ ] hogs all his life if he wanted to." *Id.* at 572-74. He also claimed that Tyson knew at the time it made this promise that it intended to end its relationship with the grower. *Id.* at 578. The grower sued the company for negligence, fraud, and promissory estoppel after the company declined to supply more hogs. *Id.* at 574-75. A jury found for the grower without explaining the grounds for its decision. *Id.* at 576. The Arkansas Supreme Court affirmed, finding—under the heading "Fraud," after discussing the elements of fraud—that there was evidence to support the jury's verdict. *Id.* at 576-78. The Court observed: "We are left without recourse to determine whether the jury found liability on fraud, promissory estoppel, negligence, or on all of the theories. We will not question nor theorize about the jury's findings." *Id.* at 578.

The *Tyson* decision is inapplicable because the *Tyson* Court did not base its ruling on promissory estoppel. The Court made clear that it did not rely on a particular legal ground but instead on "the proposition that this court has shown a reluctance to invade the sanctity of the jury room in order to impeach a jury's verdict." *Id.* at 578. To the extent that the court considered the parties' substantive arguments, it discussed fraud at length, but only referenced promissory estoppel in passing. *Id.* at 576-78. As the bankruptcy court in this case explained: "The [*Tyson*] Court does not describe the elements of promissory estoppel in Arkansas or make any statement that could be construed as a holding that promissory estoppel actions can be maintained in Arkansas even if a contract exists between the parties." *In re Pilgrim's Pride*, 443 B.R. at 533. The Arkansas Supreme Court confirmed the viability of the contract bar doctrine in *Skallerup*, 309 S.W.3d at 201: "Promissory estoppel applies when the elements of a contract cannot be shown." The Growers argue that, even if *Tyson* does not control promissory estoppel, it controls on "same subject matter." However, the *Tyson* court does not address what constitutes the "same subject matter."

No. 12-10063

The *Tyson* decision also is distinguishable factually because, unlike in *Tyson*, the Growers have not shown that PPC knew that it would end its relationship with them when the company made its alleged promises of a long-term relationship. PPC contends, and the Growers do not rebut, that it intended to maintain its relationship with the Growers, but did not foresee the "severe economic stress" that caused the company to idle the Clinton plant and terminate its contracts with the Growers. This court distinguished *Tyson* factually in rejecting the City of Clinton's similar promissory estoppel claims:

> The cases are totally unlike. In [*Tyson*], the plaintiff, an independent hog raiser, presented evidence that defendant, Tyson Foods, several times specifically promised him that he would be provided hogs to raise over a long many-year term, but that Tyson had all along actually planned to send its hogs to other units as soon as they became operational. Indeed, Tyson had admitted that it all along intended its business with the plaintiff to be a stop-gap until its temporarily interrupted Missouri operations could resume, and was instead only contesting that representations to the contrary had ever been made. In contrast, the City in this case has alleged no facts sufficient to support its conclusory assertion that [the PPC official] knew his statement to be false when made. [The PPC official's] alleged statement is so vague as to be essentially meaningless.

*City of Clinton III*, 632 F.3d at 154-55.

In sum, the contracts between PPC and the Growers bar PPC's oral promises because the contracts address the same subject matter as the Growers' claims. Because we find that this contract bar precludes the Growers' promissory estoppel claims, we do not address the other issues raised on appeal.

4. Conclusion

Accordingly, we AFFIRM the grant of summary judgment.

10